**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **ANNE CRABBS,** *et al.* | : | |
| | : | **Case No. 2:16-cv-387** |
| **Plaintiffs,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Jolson** |
| **RASHAD PITTS,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter is before the Court on Cross-Motions for Summary Judgment – Plaintiffs'
Motion for Partial Summary Judgment (ECF No. 70) and Defendants' Motion for Summary
Judgment (ECF No. 82). For the reasons set forth below, Plaintiffs' Motion is **DENIED** and
Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

### A. Factual Background

Defendant Russell L. Martin is the Sheriff of Delaware County Ohio. Defendants Rashad
Pitts, Robert Wilson, Andrew Lee, Derek Keller, Monica Andrews, and James Brian Mox are
employees of the Delaware County Sherriff's Office ("DCSO"). Plaintiffs Anne Crabbs and
James Crabbs are the parents of Mr. Keith Crabbs[1]. At all relevant times, the Crabbs' lived on
Willow Springs Drive in Lewis Center, Ohio. Ms. Dora D'Amato and her husband Roland
D'Amato reside in the same residential neighborhood as the Crabbs. (ECF No. 57-3 at 10).

---

[1] Mr. Keith Crabbs was a named plaintiff in the above-captioned action until he passed away. Ms. Crabbs
is proceeding as his personal representative. (ECF No. 49). Throughout the Order, "Mr. Crabbs" refers
to Keith Crabbs, not James Crabbs.

In 2010, Mr. Crabbs shot and killed a man and was subsequently charged with voluntary manslaughter. He was acquitted after a jury found he acted in self-defense. Mr. Crabbs alleges that after he was acquitted, Ms. D'Amato began a "campaign" against him, including allowing her dog to defecate in the Crabbs' yard and shining a flashlight in his window. (ECF No. 57-3 at 10). Ms. D'Amato acknowledges that she did walk her dog near the Crabbs' home with a flashlight, but contends that did not allow him to defecate there and did not shine the flashlight in the window. (ECF No. 71 at 11-13, 52). In her version of events, Mr. Crabbs frequently yelled obscenities at her unprovoked. (*Id.* at 45).

## 1. September 30, 2014

On September 30, 2014, around 8:45 p.m., DCSO Dispatch received a 911 call from Mr. D'Amato, who claimed that Mr. Crabbs just threatened to kill his wife and another neighbor, Jack Whitlinger. (ECF No. 58-3). Mr. D'Amato indicated to Dispatch that he thought Mr. Crabbs had been arrested for murder before and was unstable. (*Id.*). Deputies Pitts and Wilson responded to the call, arriving at the D'Amato residence approximately eight minutes later. (ECF No. 57-9 at 27-28). They spoke to Ms. D'Amato about the incident, and she told them that Mr. Crabbs had threatened her life while she was walking her dog. (ECF No. 71 at 19, 21). Ms. D'Amato then ran Jack Whitlinger's house across the street. (*Id.*). Ms. D'Amato stated that she recorded the audio on her cell phone. (ECF No. 57-9 at 32). The officers reviewed the cell phone video, which contains audio of a car horn honking repeatedly and a man whom she reported to be Mr. Crabbs yelling, "I'm going to fucking kill that woman. Call the Sheriff Jack and I will kill you too bitch." (ECF No. 75). Ms. D'Amato also reported that Mr. Crabbs harassed her in the past and she had previously reported it to DCSO. (ECF No. 57-10 at 59).

After listening to the recording and interviewing the D'Amatos, Deputies Pitts and Wilson determined that there was probable cause to charge Mr. Crabbs with the misdemeanor of Aggravated Menacing. (ECF No. 57-10 at 19; ECF No. 57-7 at 89); O.R.C. 2903.21. Deputy Wilson pulled up information on Mr. Crabbs and learned that he has a Concealed Carry Weapon (CCW) Permit, and dispatch informed the officers that there was an in-house caution for Mr. Crabbs that stated "threats to law enforcement in the past." (ECF Nos. 57-10 at 12; 57-9 at 35; ECF No. 61-9). After observing that Mr. Crabbs appeared highly agitated on the cell phone recording, Deputy Wilson decided to call for back up. (ECF No. 57-10 at 8). Deputies Lee and Elverson responded to the call for backup and arrived at the D'Amato residence. (ECF No. 57-7 at 83; ECF No. 57-4 at 54). The newly arrived deputies reviewed the video, discussed arresting Mr. Crabbs for aggravated menacing with Deputies Pitts and Wilson, and were informed that Mr. Crabbs was a CCW permit holder. (ECF No. 57-4 at 59, 69; ECF No. 57-7 at 84).

The four deputies then proceeded to the Crabbs' residence, arriving around 9:16 p.m. (ECF No. 57-9 at 37). Deputy Lee waited near one entrance of the cul de sac and Deputy Elverson went to the other entrance, while Deputies Pitts and Wilson knocked on the front door. (ECF No. 57-7 at 88; ECF No. 57-10 at 14). Ms. Crabbs opened the door and informed the deputies that her son was not home—he was out getting tobacco, visiting a friend, and taking tires to mechanic friend. (ECF No. 57-2 at 22). Ms. Crabbs told the deputies she would call them when he arrived home. (*Id.*). Before the deputies left the property, they looked in the garage with Ms. Crabbs' permission and confirmed that Keith Crabbs was driving Ms. Crabbs' black Cadillac. (ECF No. 63-1 at 29). Deputies Lee and Elverson then waited in the neighborhood while Deputies Wilson and Pitts returned to the D'Amato residence to record the video. (ECF No. 57-10 at 18). While standing in the D'Amatos' driveways, Deputies Wilson

and Pitts saw Ms. Crabbs' black Cadillac drive by. (*Id.* at 20). After observing the vehicle, Deputy Pitts drove directly to the Crabbs' residence with the intent to arrest Mr. Crabbs for Aggravated Menacing. (*Id.* at 28). Deputy Wilson drove another route, in the opposite direction of Mr. Crabbs in case he attempted to evade Deputy Pitts. (*Id.*).

Deputy Pitts arrived at the Crabbs' residence shortly after Mr. Crabbs backed the Cadillac into the driveway, exited the car, and began moving toward the front door. (ECF No. 57-9 at 53). Deputy Pitts exited his cruiser, pulled his weapon, and yelled for Mr. Crabbs to stop. (ECF No. 57-3 at 16). Mr. Crabbs testified that when he heard a voice behind him, he turned around, put his hands in the air, and stated: "I have a weapon. I have a license. What are you doing on my property? Do you have a warrant?" (ECF No. 57-3 at 18). According to Mr. Crabbs, Deputy Pitts responded, "no" so Mr. Crabbs said, "Then get off my property and go get your warrant. Bye. Bye." (*Id.*). Mr. Crabbs then stepped into his home. (*Id.*).

According to Deputy Pitts, when Mr. Crabbs got out of the car he engaged in an action known as "blading," meaning that he touched his hand on his right side near his waistband, suggesting to Deputy Pitts that Mr. Crabbs had a gun (ECF No. 57-9 at 53; ECF No. 58-8). Deputy Pitts testified that he told Mr. Crabbs to stop multiple times but Mr. Crabbs did not listen to his command to stop immediately. (ECF No. 57-9 at 53). Deputy Pitts' incident report states that after several commands to stop, Mr. Crabbs finally turned around and said, "What the fuck did I do? I am at my house and I ain't going to jail!" (ECF No. 58-8). Deputy Pitts testified in a related state court case that he explained to Mr. Crabbs that he just needed to talk to him. (ECF No. 63-1 at 10). Deputy Pitts also testified that Mr. Crabbs never said he was a CCW holder or that he had a weapon, but Deputy Pitts was aware that Mr. Crabbs had a CCW permit and could tell he was carrying a weapon because of the bulge in his pants. (*Id.* at 9, 12). An email from

Sergeant Karbler, a DCSO supervisor who responded to the scene, states that Mr. Crabbs did acknowledge to Deputy Pitts that he had his gun. (ECF No. 58-10). In any event, Deputy Pitts reported that Mr. Crabbs then ran into his house and attempted to close the front door, but Deputy Pitts followed him and attempted to grab his arm. (ECF No. 58-8).

The dash cam on Deputy Pitts' cruiser captured Officer Pitts telling Mr. Crabbs to "stop" and Mr. Crabbs eventually putting his hands in the air, but does not capture any audio of the discussion before the two men proceeded into the house. (Plaintiff Ex. 67). Officer Pitts did not have his body microphone with him because he had been using it to record the video Ms. D'Amato had on her phone and he threw it down and followed the Cadillac after he spotted it driving by. (ECF No. 57-9 at 79-80).

After Mr. Crabbs went into his house and Deputy Pitts followed him, it is undisputed that Deputy Pitts tased Mr. Crabbs. (ECF No. 57-9 at 53). Deputy Pitts' Taser Report shows that his taser was used for 18 seconds on September 30, 2014. (ECF No. 58-4 at 6). The remaining details, however, appear heavily disputed. Mr. Crabbs testified that Deputy Pitts tased him in the back right after they entered the house, and that there was no struggle whatsoever. (ECF No. 57-3 at 18). Ms. Crabbs witnessed the tasing and testified that she did not see her son struggling with the officers, and she did not think Mr. Crabbs was even aware that the officers followed him into the house. (ECF No. 57-2).

Deputy Pitts, on the other hand, testified that there was a struggle, during which Mr. Crabbs was lifting his shirt up and attempting to go for his gun. (*Id.* at 53, 64). According to Deputy Pitts, he grabbed Mr. Crabbs after they walked through the door and then tackled him into a little table. (*Id*. at 55-56, 60). He contends that both he and Mr. Crabbs were on the ground at one point, but then they were able to stand up and face each other. (*Id*. at 60, 63). At

that point, Deputy Pitts stated that Mr. Crabbs started lifting his shirt up and Deputy Pitts pulled out his gun. (*Id.* at 63, 65). Deputy Wilson had entered the house by that point, and Deputy Pitts testified that Deputy Wilson was still struggling with Mr. Crabbs when Deputy Pitts pulled out his firearm. (*Id.* at 65). Ms. Crabbs was yelling, "Don't shoot my baby" and Deputy Pitts made a split-second decision to use his taser instead of the gun. (*Id.* at 65-69). Deputy Pitts testified that Deputy Wilson spun Mr. Crabbs around so that his back was facing Deputy Pitts, and then Deputy Pitts tased Mr. Crabbs in the middle of his back. (*Id.* at 69-70). Deputy Pitts stated that Mr. Crabbs dropped immediately after he was tased, and went straight down on his stomach. (*Id.* at 74).

Deputy Wilson testified that he saw Deputy Pitts running up to the front door when he arrived at the Crabbs' residence. (ECF No. 57-10 at 69). Deputy Wilson then took off running to the front door, which was already open, and into the house. (*Id.*). Deputy Wilson did not recall himself, Deputy Pitts, or Mr. Crabbs ever falling before Mr. Crabbs was tased. (*Id.* at 77). He did testify that he turned Mr. Crabbs around so that Deputy Pitts had a clear shot with the taser. (*Id.* at 70). Deputy Wilson testified that Mr. Crabbs did not go down immediately, and that he assisted Mr. Crabbs to the ground after he was tased, holding his right arm as he went down. (*Id.* at 82).

Deputy Lee arrived at the scene right after Mr. Crabbs was tased by Deputy Pitts. Mr. Crabbs testified that Deputy Lee "came stumbling in the door and shot [him] again" with the taser. (ECF No. 57-3 at 18). Ms. Crabbs testified that when Deputy Lee entered the home, he yelled "Move" to her and then tased Mr. Crabbs, who was already on the ground on the floor. (ECF No. 57-2 at 34). Deputy Lee denies ever drawing his taser, and his Taser Report indicates that his taser was not used on September 30, 2014. (ECF No. 57-7 at 11; ECF No. 88). Deputy

Lee testified that when he arrived at the Crabbs' home, he ran straight into the residence. (*Id.* at 99). When he walked in, Deputy Lee saw Mr. Crabbs lying in the hallway in the main entrance, and Deputy Pitts was holding his taser after he deployed it. (*Id.*). Deputy Lee testified that Deputy Pitts wanted him to secure Mr. Crabbs, so Deputy Lee then placed Mr. Crabbs in handcuffs. (*Id.* at 102-03). Deputy Pitts told Mr. Crabbs he was under arrest for aggravated menacing and read him his Miranda rights. (*Id.* at 106-07). After he was arrested, Mr. Crabbs admits that he was highly agitated, and that he made statements such as "I'll kill each one of them [deputies] one by one" but testified that he did not mean it, he was just "mad as hell" after having "been tased twice." (ECF No. 57-3 at 24). Mr. Crabbs was transported to the Delaware County Jail. (ECF No. 58-6). After speaking with Sergeant Karbler, Deputy Wilson determined that Mr. Crabbs would be charged with aggravated menacing, resisting arrest, and a felony CCW violation. (ECF No. 57-10 at 44-45).

After the incident, Sergeant Karbler conducted an initial review of the use of force. (ECF No. 57-6). That night, after speaking to Deputy Pitts, Sergeant Karbler emailed senior command, including Chief Yankie and Sheriff Martin, stating, "it appears that the actions were within the policy and necessary to affect a safe arrest." (ECF No. 58-10). Per policy, the Response to Resistance ("RTR") Board was then tasked with investigating and determining whether or not the deputies' actions complied with the RTR Policy. The Board compiled a package, ultimately finding that Deputy Pitts followed departmental policy when he deployed his taser. (ECF No. 61-7). The Board's finding confirmed that the taser was deployed for 18 seconds. (*Id.*).

2. October 2, 2014

On October 1, 2014, while Mr. Crabbs was still incarcerated as a result of the September 30 incident, Ms. D'Amato obtained a "Criminal Protection Order" against him. (ECF No. 58-11). The Order required Mr. Crabbs to turn over all deadly weapons and CCW licenses in his possession to the Delaware County Sheriff Department. (*Id.*).

The next day, Mr. Crabbs was released from jail after being affixed with an ankle monitor. (ECF No. 57-2 at 45-46). His mother came to pick him up and they drove straight home. (*Id.*). When they arrived home, several DCSO cruisers were already outside. (*Id.* 46-47). The officers were apparently gathered for two purposes: first, a group of deputies, including Lee, Elverson, and Andrews, were there to collect Mr. Crabbs' firearms pursuant to the Criminal Protection Order. (ECF No. 57-4 at 11; ECF No. 67-1 at 30). Second, DCSO received a tamper alert regarding the GPS monitor on Mr. Crabbs' ankle, so a group of officers, including Lieutenant Buttler, responded to the alert. (ECF No. 57-1 at 106). When Mr. Crabbs and Ms. Crabbs arrived home, officers handcuffed Mr. Crabbs in the driveway. (ECF No. 57-2 at 47). Ultimately, it was determined based on the timing of the tamper that the tamper occurred when Mr. Crabbs was being fitted for the GPS monitor at the DCSO jail and he had not, in fact, tampered with the ankle monitor. (ECF No. 57-1 at 117-118).

When Mr. Crabbs and his mother entered their home, deputies followed them in. (ECF No. 57-4 at 112-113; ECF No. 67-1 at 24, 30). Mr. Crabbs stated that he did not invite them in. (ECF No. 57-3 at 58). Deputy Andrews testified that no verbal consent was given for the deputies to enter the home, but no refusal or arguments occurred either. (ECF No. 67-1 at 33). Once everyone was inside the house, at least two officers went upstairs with Ms. Crabbs to collect the firearms from the safe where they were kept, while at least two officers, including Deputy Andrews, stayed downstairs with Mr. Crabbs, who was told he was not allowed to go

upstairs. (ECF No. 67-1 at 31-32; ECF No. 57-3 at 58). Ms. Crabbs testified that five or six deputies went upstairs with her, and that while she was upstairs with the officers, she observed them "fingering the things at the dresser and messing in closet" and moving clothes in the closet. (ECF No. 57-2 at 52, 60). Both Mr. Crabbs and Ms. Crabbs testified that a dresser was broken as a result of the incident. (ECF No. 57-3 at 60; ECF No. 57-2 at 61). Deputy Elverson was one of the officers who went upstairs with Ms. Crabbs, and he testified that other than the safe, no other areas of the house were searched. (ECF No. 57-4 at 114).

The deputies were unable to open the safe, so Ms. Crabbs suggested that they allow her son to do so. (ECF No. 57-2 at 50). She then went to get Mr. Crabbs from downstairs, and testified that she observed officers looking through things on the counter. (*Id.* at 52). Mr. Crabbs went upstairs and opened the safe, after which time Ms. Crabbs told the officers which guns were hers and which belonged to Mr. Crabbs. (*Id.* at 50-51). Before leaving the Crabbs' residence, the deputies filled out an inventory sheet of the property taken, which Mr. Crabbs signed off on. (ECF No. 57-3 at 60). Mr. Crabbs contends that in addition to the items listed on the inventory list, the officers took a laser range finder and ammunition. (*Id.* at 46). Mr. Crabbs' firearms were later returned and he signed a release acknowledging the return of his property. (ECF No. 81-1). Mr. Crabbs contends that the laser range finder and ammunition were never returned. (ECF No. 57-3 at 46).

### 3. Subsequent Events

On September 23, 2015, Mr. Crabbs and Ms. Crabbs filed suit in Delaware County Common Pleas Court against Deputies Lee, Wilson, and Pitts, and the D'Amatos, asserting claims of false arrest and assault against the officers arising out of the events of September 30, 2014. (ECF No. 60-2). Sheriff Martin was aware of the litigation. (ECF No. 78 at 40).

On December 22, 2015, Mr. Crabbs was involved in a car accident. (ECF No. 59-4 at 4). After being rear-ended, Mr. Crabbs called the Ohio State Highway Patrol to report the accident and request a trooper. (ECF No. 57-3 at 77, 79). Deputy Mox of the DCSO also responded to the accident scene to investigate. (ECF No. 57-8 at 10, 17). After Deputy Mox had a discussion with the Highway Patrol Officer, the Patrol Officer left and Deputy Mox took over the investigation. (*Id.*). Later that evening, Deputy Mox sent an email to his supervisor, Sean Bobb and copied several other individuals, including Sheriff Martin and Deputy Lee. (ECF No. 59-4). The email stated that Mr. Crabbs properly advised Deputy Mox that he was a CCW holder and he was carrying, and that he and Mr. Crabbs did not have any problems with each other. (*Id.*). The email further stated that Mr. Crabbs did make "a few statements that were concerning." (*Id.*). Specifically, after Deputy Mox asked Mr. Crabbs if he was injured, Mr. Crabbs said he had a broken back but not from the crash, and then began to explain the September 30 incident involving Deputy Pitts and Deputy Lee, stating that he had to have several vertebrae fixed as a result of the altercation. (*Id.*). According to Deputy Mox, Mr. Crabbs stated that he couldn't wait to get his hands on Deputy Lee, "it is not if it happens, it is when it is going to happen" and he does not hold grudges, he gets revenge. (*Id.*). Mr. Crabbs denied ever making any threats against Deputy Lee. (ECF No. 57-3 at 81-82).

Deputy Lee testified that Deputy Pitts called him to let him know about the incident that Deputy Mox described. (ECF No. 57-7 at 45). Deputy Lee then called Sheriff Martin and expressed concern for his own safety and the safety of his wife. (ECF No. 78 at 52-53). Chief Deputy Patrick Yankee responded to the email thread that Deputy Mox began and stated that he would like to contact the prosecutors to see if there were any charges that could be filed or a way to revoke Mr. Crabbs' CCW as a result of the contact, in case Mr. Crabbs did "try something

later" and the DCSO "didn't do everything we could." (ECF No. 59-4). Lieutenant Buttler then spoke to the Assistant Municipal Prosecutor, who informed him that they "may have enough to criminally charge Mr. Crabbs with Menacing (M-4)" but it was "probably not a strong case." (*Id.*). Lieutenant Buttler relayed the conversation to Deputy Lee. (*Id.*).

Thereafter, Deputy Lee pressed charges against Mr. Crabbs for menacing and obtained a protection order. (ECF No. 59-3). Deputy Mox was advised to change his original offense report—which characterized Mr. Crabbs' conduct as "suspicious activity"—to reflect the criminal offense of menacing. (*Id.*). In February of 2016, a jury trial was held on Deputy Lee's charges against Mr. Crabbs, resulting in a mistrial. (ECF No. 57-7 at 56). In April of 2016, Deputy Lee decided he no longer wanted to go forward with the case and dropped the charges. (*Id.*).

## B.     Procedural Background

On April 30, 2016, Anne Crabbs, Keith Crabbs, and James Crabbs initiated this lawsuit against Deputies Pitts, Wilson, Lee, Keller, Andrews, and Mox, and Sheriff Martin. (ECF No. 1). The Amended Complaint, filed on May 29, 2016, brought the following causes of actions: (1) Unconstitutional Search and Seizure in Violation of the Fourth Amendment against Deputies Pitts, Wilson, Lee, and Keller arising out of the September 30 incident (Counts I and III); (2) Excessive Use of Force against Deputies Pitts, Lee, Wilson and Keller arising out of the September 30 incident (Count II); (3) Fabrication of Evidence and Concealment of Evidence against Deputies Pitts, Lee, Wilson and Keller (Count IV); (4) Unconstitutional Search and Seizure against Deputies Lee and Andrews arising out of the October 2 incident (Counts V and VI); (5) Deliberate Indifference against Sheriff Martin arising out of the tasing of Mr. Crabbs (Count VII); (6) Destruction of Evidence against Defendant Martin (Count VIII); (7)

Unconstitutional Policy against Sheriff Martin regarding the October 2 incident (Count IX); and (8) First Amendment Retaliation against Deputies Lee, Pitts, and Mox and Sheriff Martin (Counts X and XI). (ECF No. 13). On June 13, 2017, this Court granted an order substituting "Ms. Crabbs, personal representative of Keith Crabbs, deceased," as a plaintiff in this action, after Mr. Crabbs passed away. (ECF No. 49).

On September 25, 2017, Plaintiffs filed a Motion for Partial Summary Judgment, seeking summary judgment on three claims: the First and Third Claims for unconstitutional search and seizure against Deputies Pitts, Wilson, and Lee arising out of the September 30 events, and the Sixth Claim for unconstitutional search against Deputies Lee and Andrews arising out of the October 2 events. (ECF No. 70). On October 2, 2017, Defendants filed a Motion for Summary Judgment seeking summary judgment on all claims. (ECF No. 82). These Motions are fully briefed and ripe for decision.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 251-52 (1986)). "[S]ummary

judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### III.    ANALYSIS

As an initial matter, Plaintiffs stated in their Response in Opposition to Defendants' Motion for Summary Judgment that they are no longer pursuing any claims against Defendant Derek Keller. (ECF No. 86 at 1). Therefore, Mr. Keller is **DISMISSED** from this action. Further, through briefing and oral argument, Plaintiffs stated that they are no longer pursuing the Eighth Claim for destruction of evidence, the Ninth Claim against Sheriff Martin arising out of the October 2, 2014 entry of the Crabbs' home, or the Eleventh Claim for First Amendment retaliation against Sheriff Martin. (*Id.*; Transcript of June 19, 2018 Hearing ("Transcript")). Finally, while Plaintiffs are still pursuing a First Amendment Retaliation claim against Deputies Lee and Mox, they are no longer pursuing First Amendment retaliation against Deputy Pitts. (*Id.*). Those claims are hereby **DISMISSED**.

As for the remainder of the claims, Plaintiffs bring them against Defendants under 42 U.S.C. § 1983. To ultimately prevail, Plaintiffs must show: (1) the deprivation of rights secured by the Constitution or federal statues (2) caused by a person acting under the color of state law. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). The parties agree that the Defendant officers were persons acting under state law. (ECF No. 82 at 16). The only questions that remain are whether the officers deprived Plaintiffs of a constitutional right, and, if so, whether the officers are nevertheless shielded from liability by qualified immunity.

Under the doctrine of qualified immunity, government officials are not liable for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (internal quotations omitted)).  Qualified immunity is a two-step analysis: this Court must determine whether the officers violated Mr. Crabbs' constitutional rights, and if so, whether those rights were clearly established at the time. *Smith v. Stoneburner*, 716 F.3d 926, 929 (6th Cir. 2013) (*citing Pearson*, 555 U.S. at 236)).  In the Sixth Circuit, when analyzing whether a constitutional right was clearly established, courts "must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] circuit, and finally to decisions of other circuits." *Denton v. Rievley*, 353 F. App'x 1, 5–6 (6th Cir. 2009) (quoting *Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Cir. 2009)).

In this context, "clearly established" means that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotations omitted)).  Courts must "define the 'clearly established' right at issue on the basis of the 'specific context of the case.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citing *Saucier*, 533 U.S. at 201).  Such specificity is "especially important in the Fourth Amendment context" because of the highly fact-intensive nature of the inquiry.  *Wesby*, 138 S. Ct. at 590  (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*).  Thus, liability will not attach unless there exists "a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* (quoting *White v. Pauly*, 137 S. Ct. 538, 552 (2017) (*per curiam*).  Plaintiffs bear the burden of showing that Defendants are not entitled to qualified immunity.  *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).

## A. Search & Seizure Claims

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. Amend. IV. The "very core" of the Fourth Amendment is "the right . . . to retreat into [one's] own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961) (internal quotation marks omitted)). Thus, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez,* 540 U.S. 551, 559 (2004) (internal quotation marks omitted). For a warrantless search to be valid, the government must show either that the search falls into one of the defined exceptions to the warrant requirement, *see Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971), or that the government obtained voluntary consent from an occupant with authority over the premises, *see Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973)).

Exigent circumstances that justify warrantless entry are "situations where real immediate and serious consequences will certainly occur if a police officer postpones action to obtain a warrant." *Thorne v. Steubenville Police Officer*, 463 F. Supp. 2d 760, 771 (S.D. Ohio 2006) (Marbley, J.), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Thorne v. Lelles*, 243 F. App'x 157 (6th Cir. 2007). Circumstances that may give rise to exigent circumstances include: "(1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; and (4) a risk of danger to the police or others." *Id.* at 771-72 (quoting *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994) (internal citations omitted)). The Sixth Circuit has instructed "whether exigent circumstances existed to excuse a warrantless arrest is a question for the jury provided that, given the evidence on the matter, there

is room for difference of opinion." *Ingram v. City of Columbus*, 185 F.3d 579, 587 (6th Cir. 1999).

1.  September 30, 2014

Plaintiffs contend that Deputies Pitts, Lee, and Wilson violated the Fourth Amendment when they entered into Plaintiffs' home without a warrant on September 30 and arrested Mr. Crabbs. (ECF No. 70 at 10). Defendants argue that a warrant was not required because: (1) Deputy Pitts was in hot pursuit of Mr. Crabbs; and (2) there was an immediate risk of danger to the responding deputies and to others. (ECF No. 82 at 17-18).

Under the "hot pursuit of a fleeing felon" exception, "a suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place." *Cummings v. City of Akron*, 418 F.3d 676, 685–86 (6th Cir. 2005) (citing *United States v. Santana*, 427 U.S. 38, 43 (1976). A "typical" hot pursuant situation involves a suspect who "commits a crime, flees and thereby exposes himself to the public, attempts to evade capture by entering a dwelling, and the emergency nature of the situation necessitates immediate police action to apprehend the suspect." *Id.* (internal citations omitted). As the Sixth Circuit explained, the "pursuit" begins when "police start to arrest a suspect in a public place, the suspect flees, and the officers give chase." *Smith v. Stoneburner*, 716 F.3d 926, 931 (6th Cir. 2013). "What makes the pursuit 'hot' is the emergency nature of the situation requiring immediate police action." *Id.* Importantly, the Sixth Circuit has stated that "if there is no underlying *felony*, the 'hot pursuit of a fleeing felon' exception to the warrant requirement is untenable." *Cummings*, 418 F.3d at 686 (emphasis added).

Here, it is undisputed that the deputies were planning on arresting Mr. Crabbs for a *misdemeanor*—Aggravated Menacing in violation of Ohio Revised Code Section 2903.21. (ECF

No. 57-10 at 19; ECF No. 57-7 at 89; ECF No. 58-12). While some courts do discuss this exception as the "hot pursuit of a fleeing *suspect*," Defendants have pointed the Court to no cases where a suspect committed a misdemeanor and the Court found the "hot pursuit" exception to apply.[2] Further, Defendants abandoned this argument at oral argument. (*See* Transcript). The Court, therefore, declines to apply this exception to the case at bar and will focus on Defendants' second argument, that a warrant was not needed because there was an immediate risk of danger to themselves or others.

The "immediate risk of danger" exigency permits officers to make a warrantless entry into a residence when they reasonably believe that the suspect presents an immediate risk of harm to the arresting officers or the public. *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992) (finding no warrant required when officers received call of a suicidal and possibly homicidal gunman and arriving officers observed a long gun against the wall next to the front door). Defendants argue that an immediate risk of danger existed because Mr. Crabbs threatened to kill his neighbors earlier that evening, Mr. Crabbs appeared agitated in the recording of the threat, an in-house caution warned Deputy Pitts that Mr. Crabbs had made threats to law enforcement in the past, Mr. Crabbs was armed at the time of the interaction, and he was "blading." (ECF No. 82 at 18). Plaintiffs, on the other hand, note that the alleged threats occurred earlier in the evening, Ms. D'Amato was at home and no longer near Mr. Crabbs, and no threats were made to any deputies before Mr. Crabbs entered the house. (ECF No. 86 at 17). Under Plaintiffs' version of the facts, Mr. Crabbs was not blading, but was lawfully carrying a

---

[2] Defendants cite *Thornton v. City of Columbus*, for the proposition that the exigent circumstance exist when an officer is in "hot pursuit of a fleeing suspect," but *Thornton* relied on the possibility of the immediate risk of harm to officers or others, not the hot pursuit doctrine. No. 2:15-CV-1337, 2017 WL 2573252, at *9 (S.D. Ohio June 14, 2017), *aff'd*, No. 17-3743, 2018 WL 1313419 (6th Cir. Mar. 14, 2018) (finding that exigent circumstances existed when "[o]fficers reasonably believed that they or the inhabitants of the residence were in danger"). *Thornton*, therefore, is discussed in greater detail below.

firearm, and testified that he so indicated to the officers. He also testified that he specifically asked whether the officers had a warrant, and only turned to enter the home when Deputy Pitts said "no." With these disputed facts, whether an immediate risk of danger was present that would justify Officer Pitts' entry into the home is better left for the jury.

Defendants rely on this Court's opinion in *Thornton v. City of Columbus* to argue that exigent circumstances existed here. In *Thornton*, the Columbus Police Department received an emergency call reporting that a man at the plaintiff's address—later determined to be the plaintiff—had pointed a gun at the caller's son and his friends, and when the caller approached to ask why he pulled a gun, the man pointed the gun at him. 2017 WL 2573252, at *1 (S.D. Ohio June 14, 2017). When the responding officers arrived at the scene, there was a group of people gathered outside of the house, and some officers reported seeing a man with a long gun run from the front porch to the inside of the house. *Id.* At least one of the people gathered outside the plaintiff's home yelled that the plaintiff had a gun and had just run inside. *Id.* Officers then observed the plaintiff walking from the bedroom to the living room holding the shotgun. *Id.* at *2. Officers testified that once they entered the house, the plaintiff was looking right at them, ignored their demands to drop the weapon, and instead walked directly toward them. *Id.* The officers then shot the plaintiff. *Id.* The plaintiff disputed that version of events, and testified that he was shot before he was even aware of the officers' presence. *Id.* The Court found that "[t]he case law is clear that exigent circumstances existed under these facts—as the Officers reasonably believed that they or the inhabitants of the residence were in danger, given that an individual who had demonstrated a willingness to use the weapon was inside." *Id.* at *9.

*Thornton* is distinguishable from the case sub judice. First, the emergency call stating that a man was pointing his gun at multiple individuals came in around 7:58 p.m., and officers

arrived on the scene only about two minutes later, around 8:00 p.m. *Id.* at *1. The close timeline of events heightens the sense of emergency in *Thornton*, whereas here, the timeline is significantly more drawn out—the threats allegedly occurred around 8:00 p.m., the D'Amatos called 911 around 8:45 p.m., the first deputies arrived to the D'Amato residence approximately eight minutes later, spoke to the D'Amatos for approximately eighteen to twenty minutes, then drove to the Crabbs' residence but Mr. Crabbs was not home, and only after returning to the D'Amatos residence did they see him drive by. (ECF No. 71 at 11; ECF No. 58-3; ECF No. 57-9 at 27-28, 31-32; ECF No. 57-2 at 24-25). Second, pointing a gun at someone is a more serious threat than yelling words. True, Mr. Crabbs has a CCW and was carrying a firearm, but accepting Defendants' arguments here runs the risk of dispensing with the warrant requirement anytime a person who possesses a CCW permit is alleged to have committed aggravated menacing by threatening an individual. Finally, there is no allegation here that Mr. Crabbs was ever walking toward the deputies holding a gun, like the plaintiff in *Thornton*. Instead, it is undisputed that Mr. Crabbs was walking *away* from the officers when Deputy Pitts attempted to grab his arm. For these reasons, *Thornton* is distinguishable. There is a genuine dispute of material fact as to whether exigent circumstances existed here.

Defendants are not entitled to qualified immunity on the search and seizure claims arising out of the September 30 incident. The issue of qualified immunity is "usually a purely legal question to be determined by the court," but "summary judgment is inappropriate where the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Thorne*, 463 F. Supp. 2d at 776. As discussed in detail above, there is a genuine dispute of material fact as to whether the officers violated Plaintiffs' constitutional rights. This dispute of material fact impacts the "clearly established" analysis—accepting Plaintiffs' version of the

disputed facts, it is clearly established that an officer cannot enter a home without a warrant to arrest an individual for a misdemeanor offense when the individual was not fleeing the scene of a crime nor threatening the officers. *See Welsh v. Wisconsin*, 466 U.S. 740, 754 (1984). Defendants so agreed during oral argument, stating that if the Court finds that there are genuine disputes of material fact, their qualified immunity argument would be defeated. (*See* Transcript). Both parties' Motions for Summary Judgment are therefore **DENIED** as to Claims I and III.

## 2. October 2, 2014

Plaintiffs next contend that Deputies Lee and Andrews violated the Fourth Amendment when they entered Plaintiffs' home without a warrant on October 2, 2014, searched the home, and seized Mr. Crabbs' property. (ECF No. 70 at 15). Defendants respond that Deputies Lee and Andrews did not conduct a search of Plaintiffs' home, as they did not go upstairs and were not specifically identified by Plaintiffs as the deputies searching the home. (ECF No. 82 at 26). Defendants further contend that even if Deputies Lee and Andrews did search the home, the search was constitutional because Plaintiffs gave effective, valid consent. (*Id.*).

As an initial note, Defendants point to no case law to support their proposition that if they were not searching once they entered the house, their warrantless entry does not constitute a violation of the Fourth Amendment. Indeed, it makes little sense to excuse a warrantless entry based on the actions that deputies took once inside the home, given that the basic Fourth Amendment right—to be free from unreasonable governmental intrusion in one's own home— would be obliterated if officers could enter the sanctity of one's home without a warrant or consent.

Turning to the consent issue, it is "well settled that a person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter*, 378 F.3d 584, 588 (6th

Cir. 2004). Consent may be given "in the form of words, gesture, or conduct" and no verbal "magic words" are necessary. *Id.* at 588, 589. "Mere acquiescence, however, does not show consent; the resident must freely invite the officer into the house." *Smith v. Stoneburner*, 716 F.3d 926, 930 (6th Cir. 2013) (citations omitted). Whether consent is freely and voluntarily given is determined by a totality of the circumstances approach. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). An examination of the totality of the circumstances includes analyzing "the age, intelligence, and education of the individual; whether the individual understands the right to refuse consent; whether the individual understands his or her constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police." *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996).

Here, there is a genuine dispute of material fact as to whether consent to enter was voluntarily given. It is undisputed that no verbal consent was given when the officers followed Mr. Crabbs and his mother into the residence. Mr. Crabbs testified that he did not invite them in, and Deputy Andrews admitted that no verbal consent was given to the deputies to enter the home. (ECF No. 67-1 at 33, ECF No. 57-3 at 58). There is evidence, however, that Plaintiffs allowed the officers to follow them into their home and did not object to the deputies' presence in their home. (ECF No. 67-1 at 33). On the other hand, there is evidence that numerous officers were waiting for Mr. Crabbs when he returned home, and he was immediately handcuffed in the driveway. (ECF No. 57-2 at 46-47). This could be seen as coercive conduct by the police.

Additionally, there is a dispute of fact as to what was searched and seized after the deputies entered the house. Plaintiffs contend that the scope of the search unreasonably extended beyond the safe that contained the weapons, testifying that the deputies rummaged through Mr.

Crabbs' closet and broke a drawer. Defendants contend that the deputies did not search outside of the safe. Defendants further contend that they seized only the firearms indicated on the inventory list. Plaintiffs contend that Defendants seized additional items, including ammunition and a laser range finder. The Court's job is not to weigh credibility at this stage. *See Smith v. City of Wyoming*, 821 F.3d 697, 710–11 (6th Cir. 2016), *as amended* (May 18, 2016).

As with the search and seizure claims arising from the September 30 incident, the genuine dispute of material facts surrounding the October 2 incident defeat Defendants' argument of qualified immunity. *See Stoneburner*, 716 F.3d at 930 (finding issue of fact as to whether consent was given defeated officer's qualified immunity argument); *see also* Transcript. Both parties' Motions for Summary Judgment as to Claims V and VI are therefore **DENIED**.

## B. Excessive Force Claim

Plaintiffs also argue that Deputies Pitts, Lee, and Wilson are liable under § 1983 for the use of excessive force against Mr. Crabbs in violation of the Fourth Amendment as a result of the tasing that occurred on September 30. This inquiry requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 388 (1989) (internal quotation marks omitted). The reasonableness inquiry is objective: courts "must consider whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Ingram v. City of Columbus*, 185 F.3d 579, 596 (6th Cir. 1999) (quoting *Graham*, 490 U.S. at 397). Reasonableness is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* In *Graham v. Connor*, the Supreme Court articulated factors a court must consider in determining whether an officers' conduct was

reasonable: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (quoting *Graham*, 490 U.S. at 396)).

Genuine disputes of material fact as to whether Deputy Pitts used excessive force abound. Mr. Crabbs testified that on September 30, after he went into his home, there was no struggle whatsoever and Deputy Pitts tased him in the back without warning. (ECF No. 57-3 at 18). Mr. Crabbs' testimony is supported by his mother's testimony: she stated that she did not witness a struggle, and from the way her son was behaving, she did not even believe that he knew the deputies followed him into the house. (ECF No. 57-2). Deputy Pitts, however, testified in detail about a struggle that allegedly occurred between he and Mr. Crabbs before Deputy Pitts deployed his taser. He testified that Mr. Crabbs was resisting arrest, and that he reached for his gun. (ECF No. 57-9 at 53, 64). It is up to a jury to determine whose testimony to believe.

Defendants' arguments in support of their Motion for Summary Judgment on this issue rely heavily on their contention that Mr. Crabbs was actively resisting arrest. (ECF No. 89 at 9) (citing cases finding that there is no clearly established constitutional right to be free from the use of taser if arrestee is actively resisting). As stated, there is a dispute of fact on this issue. Even if this dispute is resolved in Defendants' favor and it is determined that Mr. Crabbs was resisting arrest, there still may be an issue as to whether the length of tasing was excessive. Deputy Pitts' Taser Report indicates the taser was deployed for 18 seconds, a fact which Defendants do not appear to dispute. (ECF No. 58-4 at 6). Sergeant Karbler testified that if you let the trigger of a taser go, the device will fire for five full seconds, "to only apply the current

necessary to apprehend the subject." (ECF No. 57-6 at 31). Defendants do not address the length of time Deputy Pitts deployed his taser, but it could be found, as Plaintiffs argue, that 18 seconds was excessive. This is especially true given that Deputy Pitts himself testified that Mr. Crabbs went down immediately. (ECF No. 57-9 at 74). Therefore, there is a genuine dispute of material fact as to whether Deputy Pitts used excessive force.

Turning to Deputy Lee, there is a genuine dispute of material fact about whether he ever deployed his taser at all. Mr. Crabbs and Ms. Crabbs both testified that he did so, while Deputy Lee testified that he did not. (ECF No. 57-3 at 18; ECF No. 57-2 at 34; ECF No. 57-7 at 11). Defendants point to Deputy Lee's Taser Report which indicates his taser was not discharged on September 30. Even if the Court finds one parties' testimony to be more credible than another, it cannot discount either party's testimony at this stage. *See Smith*, 821 F.3d at 710–11 (finding "[t]he district court was not entitled to discount [Plaintiff's] word, even if it judged the officer to be more credible"). There remains a dispute of fact to be decided by the factfinder.

As with the search and seizure claims, because there is a dispute of fact as to whether a constitutional violation occurred, qualified immunity cannot be granted at this time. If a jury determines that the facts are as Mr. Crabbs and Ms. Crabbs described them, it would be clearly established that an officer cannot walk through a door and tase an unsuspecting individual who is not resisting arrest. *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) (finding "the right to be free from physical force when one is not resisting the police is a clearly established right") (citations omitted). Defendants' Motion for Summary Judgment on Claim II is therefore **DENIED** as against Deputy Pitts and Lee.

The excessive force claim as to Deputy Wilson, however, must be dismissed. In the Sixth Circuit, in order to hold an officer liable for the use of excessive force, a plaintiff must

prove that the deputy "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Plaintiffs do not contend that Deputy Wilson used any excessive force himself, or that Deputy Wilson is a supervisor of Deputy Pitts or Deputy Lee. Therefore, to find Deputy Wilson liable for excessive use of force, Plaintiffs must prove that he owed Mr. Crabbs a duty of protection. In order to do so, Plaintiff must show that Deputy Pitts: (1) "observed or had reason to know that the excessive force would be or was being used," and (2) he had "both the opportunity and the means to prevent the harm from occurring." *Id.* Plaintiffs presented no evidence that Deputy Wilson knew any other officer would tase Mr. Crabbs, and Mr. Crabbs himself testified that he was tased almost immediately upon entering the home, which would mean that Deputy Wilson did not have the opportunity to prevent the harm from occurring. Summary judgment on the excessive force claim as to Deputy Wilson is therefore **GRANTED** in Defendants' favor.

### C.  Sheriff Martin's Monell Liability for Excessive Force

Generally, a municipality cannot be liable for the constitutional torts of its employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Under *Monell*, liability only attaches "where the plaintiff establishes that the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007). A plaintiff can make the required showing of a policy or custom by demonstrating any of the following:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Plaintiffs contend that Sheriff Martin ratified the deputies' use of excessive force on September 30, 2014. (ECF No. 86 at 37-38). A sheriff's failure to investigate an incident can amount to ratification of the illegal act which is sufficient to establish an official policy for the purposes of *Monell* liability. *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989); *see also Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985) (finding that sheriff's failure to investigate incident where police officer allegedly beat prisoner constituted a ratification of the illegal acts and was a sufficient basis for liability). Plaintiffs must prove, however, that "ratification was a moving force in causing the constitutional violation." *Thornton*, 2017 WL 2573252, at *8 (citing *Stillwagon v. City of Delaware*, 175 F. Supp. 3d 874, 904 (S.D. Ohio 2016).

Plaintiffs argue that the inadequate investigation into the tasing constitutes ratification. This is a difficult argument to make. *See Ragsdale v. Sidoti*, 2015 U.S. Dist. LEXIS 178618, at *16-17 (N.D. Ohio June 5, 2015) (stating that there must be a "*complete* failure to initiate and conduct any meaningful investigation for *Monell* liability to arise") (emphasis added). In any event, the Court need not decide whether the investigation was adequate because, like the defendants in *Thornton*, Defendants here point out that Plaintiffs make no argument that the ratification was the "moving force" behind the alleged constitutional violations. And indeed, they cannot. Sheriff Martin's "purported ratification . . . cannot logically be the moving force behind the alleged constitutional violation because it occurred *after* the shooting, and a thing that happens after an event cannot logically be said to have caused the event that preceded it." *Thornton*, 2017 WL 2573252, at *8 (emphasis in original).

Plaintiffs could, of course, argue that Sheriff Martin has a history of failing to investigate excessive force claims which led to the excessive force used here. In order to succeed on a

theory that the city has a "custom of tolerance or acquiescence of federal rights violations," however, Plaintiffs must "go beyond the facts of [their] own case and show other instances of the alleged rights violation have occurred in other cases." *Abdulsalaam v. Franklin Cty. Bd. of Comm'rs*, 637 F. Supp. 2d 561, 577 (S.D. Ohio 2009), *aff'd*, 399 F. App'x 62 (6th Cir. 2010). Plaintiffs have pointed to no such evidence here. Defendants' Motion for Summary Judgment on Claim VII is therefore **GRANTED**.

### D. Fabrication of Evidence Claim

To prevail on a fabrication of evidence claim, Plaintiffs must show that the officers knowingly fabricated evidence and there is a reasonable likelihood that the false evidence could have affected the judgment of the jury. *Gregory v. City of Louisville*, 444 F.3d 725, 745 (6th Cir. 2006). Plaintiffs do not need to show that the deputies lacked probable cause to prevail on a fabrication of evidence claim. *France v. Lucas*, 836 F.3d 612, 629 (6th Cir. 2016).

Plaintiffs contend that the deputies fabricated evidence against Mr. Crabbs by falsifying their Enforcer Narrative Reports (ECF Nos. 58-6; 58-7; 58-8) to include false statements that he resisted arrest and that he reached for his pistol, thereby resulting in criminal charges for a CCW violation and resisting arrest. (ECF No. 86 at 25). Defendants contend that Plaintiffs have offered absolutely no evidence to support this claim. (ECF No. 89 at 13). Plaintiffs do offer some evidence, however—the same evidence discussed above: the testimony of Mr. Crabbs and Ms. Crabbs that there was no struggle, and Mr. Crabbs did not reach for his gun. If a jury credits their testimony over the testimony of the deputies, the jury could conclude that the incident reports and criminal charges were thus falsified. Therefore, there is a genuine dispute of material fact that precludes summary judgment on this issue. *See Webb v. United States*, 789 F.3d 647, 669–70 (6th Cir. 2015) (denying summary judgment on claim that DEA report contained false

statements about a suspect's height).  Qualified immunity is not warranted at this time because "it was clearly established by at least 1992 that knowing fabrication of evidence violates constitutional rights."  *Mills v. Barnard*, 869 F.3d 473, 486–87 (6th Cir. 2017) (internal citations omitted).  Defendants' Motion is **DENIED** as to Count IV.

### E.  First Amendment Retaliation Claim

Finally, Plaintiffs bring claims against Deputies Lee and Mox for First Amendment Retaliation.  The First Amendment prohibits officers "from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."  *Wilkerson v. Warner*, 545 F. App'x 413, 423–24 (6th Cir. 2013).  To establish a First Amendment Retaliation claim under § 1983, a plaintiff must prove:

> (1) that he or she engaged in constitutionally protected conduct; (2) an adverse action by defendant sufficient to deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between the first and second elements- that is, the adverse action was motivated at least in part by plaintiff's protected conduct.

*Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 207 (6th Cir. 2010).  Even if a plaintiff establishes these elements, a defendant is entitled to summary judgment if he can show that he would have taken the same action in the absence of the protected activity.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999).

Plaintiffs contend that Deputies Lee and Mox engaged in First Amendment Retaliation by filing an Aggravated Menacing charge against Mr. Crabbs after Plaintiffs filed a state court case for wrongful arrest arising from the September 30 incident.  (ECF No. 86 at 37-38).  Defendants do not dispute that  Plaintiffs engaged in constitutionally protected conduct—filing a lawsuit—or that filing a criminal charge can be considered adverse conduct.  Defendants focus on the third factor and argue that there is no evidence of retaliatory animus.  (ECF No. 82 at 28).

Proof of retaliatory intent "rarely will be supported by direct evidence of such intent." *Holzemer v. City of Memphis*, 621 F.3d 512, 525–26 (6th Cir. 2010). Circumstantial evidence can thus be used to satisfy this prong of the retaliation test. *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008). Moreover "a pattern of antagonism coupled with timing" can be used to establish a causal link. *Dallas v. Forrest*, No. 1:09-CV-10, 2010 WL 3258401, at *9–10 (S.D. Ohio May 27, 2010), *report and recommendation adopted*, No. C-1-09-10, 2010 WL 3258407 (S.D. Ohio Aug. 17, 2010). Importantly, "claims involving proof of a defendant's intent seldom lend themselves to summary disposition." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822–23 (6th Cir. 2007) (internal citations omitted); *see also Harris*, 513 F.3d at 519 ("Usually, the question of causation is a factual issue to be resolved by a jury").

Here, taking the evidence in light most favorable to Plaintiffs, as the Court must do at this stage, the Court cannot definitively say that Defendants' actions were taken without regard to Plaintiffs' action of filing a lawsuit against DCSO officers. The evidence indicates that Deputy Mox knew Keith Crabbs' identity immediately upon seeing him at the scene of the accident because the DCSO sent out an email with his photograph to alert the officers to his identity. (ECF No. 57-8 at 13-15). Deputy Mox told the Ohio State Highway Patrol trooper about the lawsuit Mr. Crabbs filed relating to the September 30 incident, and stated that Mr. Crabbs may cause problems. (*Id.* at 16-17). Despite knowing about Mr. Crabbs' history with the department, Deputy Mox sent the Ohio State Highway Patrol trooper away and took charge of the investigation. (*Id.*). After investigating the accident, Deputy Mox sent an email to his supervisor and copied Deputy Lee, stating that Mr. Crabbs threatened Deputy Lee. (ECF No. 59-4). Mr. Crabbs, however, testified that he never made any threats on the night of the accident. (ECF No. 57-3 at 81-82).

Three days after Deputy Mox wrote the email alleging Mr. Crabbs made threats against Deputy Lee, Deputy Mox was told to document the incident by command staff. (ECF No. 57-8 at 23-24). The evidence indicates that Deputy Mox's initial report on the incident categorized Mr. Crabbs' behavior as "suspicious activity," and he was later directed to change it to reflect the charge of criminal menacing. (*See* ECF No. 59-3) (Deputy Mox's report stating, "On January 6, 2015, I was advised to change this to a criminal offense"). Plaintiffs also submitted evidence showing that DCSO officers were discussing conversations with a prosecutor who stated there "may be enough to criminally charge Mr. Crabbs" but that it was "probably not a strong case." (ECF No. 59-4). This evidence, coupled with evidence of previous antagonism toward Mr. Crabbs, including an email written to DCSO leadership regarding Mr. Crabbs merely listening to loud music in his car (ECF No. 59-6), may be enough to show retaliatory animus. The question is not one for this Court—it must be decided by a jury.

As to the question of qualified immunity, "[b]ecause retaliatory intent proves dispositive of Defendants' claim to qualified immunity," summary judgment is inappropriate. *Ctr. for Bio-Ethical Reform, Inc.*, 477 F.3d at 824 (6th Cir. 2007) (holding district court erred in finding Defendants entitled to qualified immunity from Plaintiffs' First Amendment retaliation claim). Defendants' Motion for Summary Judgment as to Count X is therefore **DENIED**.

## IV. CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Partial Summary Judgment (ECF No. 70) is hereby **DENIED**. All claims against Deputy Keller are hereby **DISMISSED**. Claims VIII, IX, and XI are **DISMISSED**, as is Claim X against Deputy Pitts only, as Plaintiffs indicated intent to no longer pursue such claims. Defendants' Motion for Summary Judgment (ECF No. 82) is **GRANTED** on Count VII for deliberate indifference against Sheriff Martin, and

on Count II against Deputy Wilson only.  Defendants' Motion is **DENIED** as to Counts I and III against Deputies Pitts, Wilson, and Lee, Count II against Deputies Pitts and Lee, Count IV against Deputies Pitts, Lee, and Wilson, Count V and VI against Deputies Lee and Andrew, and Count X against Deputies Lee and Mox.


       **IT IS SO ORDERED**.

                                     **s/ Algenon L. Marbley**
                                   **ALGENON L. MARBLEY**
                                   **UNITED STATES DISTRICT JUDGE**


       **Dated: July 6, 2018**